Caleb E. Mason, Esq. (State Bar No. 246653)
WERKSMAN JACKSON & QUINN, LLP
888 West Sixth Street, Fourth Floor
Los Angeles, California 90017
cmason@werksmanjackson.com
Telephone: (213) 688-0460
Facsimile: (213) 624-1942

Attorney for Plaintiff
Toni McBride

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAPD OFFICER TONI MCBRIDE, <br><br> Plaintiff, <br><br> v. <br><br> CHIEF OF POLICE MICHEL MOORE; LOS ANGELES POLICE DEPARTMENT, <br><br> Defendants. | **Case No.:** <br><br> **Complaint for Damages and Demand for Jury Trial** <br><br> **1. Discrimination Based on Gender (42 U.S.C. § 1983)** <br><br> **2. Retaliation (Adverse Employment Action in Public Employment) for Protected Speech (42 U.S.C. § 1983)** <br><br> **3. Disparate Treatment (Cal. Gov. Code § 12940(a))** <br><br> **4. Disparate Impact in Violation of Gov. Code § 12940(a)** |

**INTRODUCTION**

1.   Plaintiff Toni McBride ("Officer McBride" or "Plaintiff") was a rising star in the Los Angeles Police Department ("LAPD" or "Department").

2.   She always dreamed of becoming a police officer, and planned to spend her career with the LAPD.

3.   But now, her career has been derailed by an arbitrary decision by the Chief of Police, Defendant Michel Moore ("Chief Moore," or collectively with LAPD, "Defendants") that he doesn't like her personal social media.  Acting solely on his own, without any basis in law or policy, and contrary to the recommendations of the chain of command, he personally intervened twice to block her career advancement: he intervened to block her transfer to Rampart Patrol, and then he intervened to overrule her promotion and assignment as an Academy Instructor, and put her on indefinite desk duty.  And he did it because he decided he didn't like her personal social media videos, and told her he would keep her "on a desk" forever, until she deleted them.

4.   This is not speculation—Chief Moore told Officer McBride what he was doing, and why, at a meeting in his office on September 30, 2022.  And he personally directed his Deputy Chief to block her promotion and assignment as an Academy instructor.

5.   Chief Moore was explicit about his reasons: he didn't like Officer McBride's personal social media videos showing her competing in and training for shooting competitions. Unless she deleted them and got off of social media completely, he told her, he would destroy her career. And he followed through.

6.   Officer McBride's videos don't violate any Department policies.  And they're virtually identical to dozens of videos regularly posted by male officers. But when it comes to Officer McBride, Chief Moore told her he didn't like the "image they present."

7.   Chief Moore's actions were blatantly sexist and unconstitutional.

8. First, Officer McBride—just like every other police officer, firefighter, teacher, clerk, sanitation worker, and every other public employee in the nation—has a First Amendment right to speak on her own time, on her own personal social media, on matters of public concern—paradigmatically including the hotly debated issues of Second Amendment rights and responsible gun ownership. The Constitution prohibits a public employer from taking adverse employment actions against employees based on their personal, off-duty speech as citizens on matters of public concern.

9. Chief Moore does not have the legal right to police the personal, off-duty social media speech of his employees, and to destroy their careers if their posts are not to his liking.

10. Second, the Fourteenth Amendment prohibits public employers from discriminating based on gender. Chief Moore is doing exactly that when it comes to Officer McBride. He has no problem with numerous virtually identical social media postings made by male officers, showing them training for and competing in shooting competitions. He has not called in those male officers and told them he's destroying their career if they don't get off social media. And he has not personally intervened to block transfers and promotions for those male officers. Just Officer McBride. That is unconstitutional.

11. The Constitution protects Officer McBride, and every other public employee in the nation, from discrimination based on gender, and from adverse employment actions based on her personal, off-duty social media statements. She should not be—and under our Constitution, cannot be—forced to accept gender-based discrimination in the workplace, or choose between her career in public service and her First Amendment rights.

**PARTIES, JURISDICTION, VENUE, AND EXHAUSTION OF ADMINISTRATIVE REMEDIES**

12.     Officer McBride is an individual who at all relevant times lived and worked in this District as an LAPD officer.

13.     Defendant LAPD is an agency of the City of Los Angeles, a municipality.

14.     Defendant Chief Moore is and at all relevant times was, the Chief of the LAPD.  He is sued in his individual and official capacities.

15.     This Court has subject matter jurisdiction because Officer McBride brings claims for relief arising under federal statutes and the federal Constitution.

16.     This Court has personal jurisdiction over all parties, because all parties live, work, and/or are located in and can be found in, this District.

17.     This Court has supplemental jurisdiction over the state-law claims because they arise from the same set of transactions and occurrences as the federal-law claims.

18.     Venue is proper in this Court because the transactions and occurrences at issue herein took place in this District, in the City of Los Angeles.

19.     As to the First and Second Claims for relief, there no exhaustion requirement for suits under 42 U.S.C. § 1983.

20.     As to the Third and Fourth Claims for relief, Officer McBride has exhausted her administrative remedies by submitting her claims to the state Department of Civil Rights and obtaining a right-to-sue letter.

21.     Officer McBride expects to receive an additional right-to-sue letter from the federal Equal Employment Opportunity Commission.  When she does, she will amend this complaint to assert a claim under Title VII of the Civil Rights Act.

# FACTS

## 2016-2019

22.     Officer McBride joined the LAPD's Level Three Reserve Police Academy at the age of 18, and was the youngest in her class.  She was also selected to be the class leader and graduated "Top Shot" of her class.  She then entered into the LAPD's Level Two Reserve Police Academy.  She was again "Top Shot" of her class and at the age of 19, became the youngest officer in LAPD history to graduate from the Level Two academy.  At the age of 20, she entered LAPD's full-time Police Academy.  She was again the youngest officer in her class and once again selected to be the class leader.  She again graduated as the "Top Shot" of her academy class in May 2018.

23.     Upon graduating from the full-time academy, she was assigned to work Rampart Division, and was proud to go to work every day to serve and protect the residents of our City.  In addition to her patrol duties, Officer McBride devoted countless hours to mentoring young women and girls who aspired to careers in law enforcement, and was often asked by LAPD personnel to assist in recruiting activities.

24.     Officer McBride is also a competitive target shooter.  She's entered— and won—target shooting competitions all over the country, and she has documented her competitions and training on social media, on YouTube and Instagram.  Her posts on those social media sites, including text, photos and videos, relating to shooting competitions and training, are collectively referred to herein as the Social Media Posts.

25.     Officer McBride believes both that Americans have the right to own guns, and that Americans who exercise that right have an obligation to do so safely and responsibly.  Her videos show her engaging in responsible training and competition exercises in a safe and regulated environment.  Her videos are her contribution to the ongoing national debate about gun safety and regulation, and

they demonstrate and emphasize that women can be safe, responsible, and highly proficient gun owners and shooting competitors, in a community, environment, and discourse that is dominated by men.  She believes that it is particularly important for her to show her skills and successes on social media because the vast majority of gun-related debate and content on the internet is produced by, and features, males.

26.    Officer McBride posted the Social Media Posts on her own personal social media pages, and not as part of her official duties.  She posted them as a citizen, to participate in the nation's public discourse on gun rights, gun safety, and gender, which are important and widely discussed matters of public concern.

**April 22, 2020**

27.    On April 22, 2020, at approximately 5:30 p.m., Officer McBride and her partner, Officer Shuhei Fugigami, were alerted to a traffic accident that had just occurred at the corner of San Pedro Street and Jefferson Boulevard in Los Angeles. A man named Daniel Hernandez was speeding north in a Chevrolet Silverado pickup truck on San Pedro (a surface street with a 30 mph speed limit), going 70 mph with the gas pedal floored (his vehicle's Event Data Recorder showed his throttle at 99 percent) and collided with a small car, a Kia Forte, that was stopped for a left turn.

28.    The Kia was severely damaged and spun around in circles.  Mr. Hernandez didn't care, and continued driving, trying to flee the scene.  He drove into oncoming traffic and collided with two more cars, severely damaging them and injuring their occupants.  Finally Mr. Hernandez crashed his pickup into a parked RV, and it came to rest.

29.    Officer McBride and her partner were the first responders on scene.  It was a chaotic scene, with four crashed and damaged vehicles, multiple injured individuals, and a crowd of bystanders rapidly growing.  Moreover, Mr. Hernandez, whom witnesses described as aggressive and "crazy" and appearing to

be under the influence of drugs, was screaming threateningly and brandishing first a long metal pipe, and then a knife.

30. Officer McBride's partner, Officer Fugigami, was approached by bystanders, who told him that the driver of the Kia was severely injured and unconscious. (In fact, her spine was fractured in five places). Officer Fugigami ran to render first aid to her. Other bystanders on the scene informed Officer McBride that Mr. Hernandez had existed his crashed pickup and was brandishing a knife, yelling and acting menacing and "crazy." and appearing to the bystanders as though he was under the influence of drugs.

31. When Mr. Hernandez saw Officer McBride, he immediately started walking towards her, brandishing a knife in his right hand, yelling, and speeding up his pace. Officer McBride warned the other bystanders to get back, and retreated approximately ten feet, until she was backed against a vehicle. She repeatedly yelled to Mr. Hernandez, telling him to drop the knife. He refused (one bystander heard his words as "I'm not throwing it down," and continued to approach her, brandishing the knife in his right hand, with both hand balled into fists. She yelled at him again to stop, but he kept coming.

32. When he got to within approximately thirty feet of her, still coming at her with the knife in his hand—and in even closer to the other bystanders, whom he had previously been threatening, as well as the injured victim in the other vehicle—Officer McBride shot him, firing two rounds. He fell to the ground, then immediately got back up and kept coming at her, still with the knife in his hand. She fired four more rounds, killing him.

33. The shooting was meticulously reviewed by the State Attorney General's Office—which conducts reviews of all officer-involved shootings. The Attorney General's report—attached hereto as Exhibit A—concludes that her actions were reasonable and appropriate. The LAPD reached the same conclusion.

Officer McBride's quick and calm reaction likely saved not only her own life but the lives of multiple bystanders.

34.     Officer McBride did her job.  She saved lives.

**2020-2022: Multiple Reviews of the Use of Force Incident Establish that Officer McBride Acted Properly**

35.     Officer McBride continued working.  Meanwhile, the incident was reviewed multiple times, by multiple entities.

36.     In April of 2020, the incident was reviewed by the Department's Behavioral Science Service. Officer McBride's actions were found to be proper and within policy.

37.     In November 2020, the incident was reviewed by the Officer Involved Shooting Use of Force Review Board, and by Chief Moore.  Again, Officer McBride's actions were found to be proper and within policy.

38.     In December 2020, the incident was reviewed by the civilian Police Commission.

39.     Again, Officer McBride's actions were found to be proper and within policy.  The only negative comment made by the Commission's final report stated that the last two rounds were unnecessary.  Chief Moore disagreed with that assessment and stated that Officer McBride's actions, including all shots fired, were proper.

40.      In Fall 2022, the incident was subjected to the definitive, and controlling, review by the California Department of Justice, which has a statutory mandate to review all officer involved shootings.  The DOJ report was released in December 2022, and analyzes Officer McBride's decisions and actions on a second-by-second basis throughout the incident.  The DOJ report concludes that everything she did, including all shots fired, was proper, reasonable, and within policy.

41.     The DOJ report concluded as follows: "After examining all the evidence, the DOJ concludes that the facts and circumstances known to Officer McBride justified her use of deadly force with each volley of shots. Based on the evidence reviewed in this case, Officer McBride actually and reasonably believed that she need to use deadly force to protect herself and others when Hernandez, armed with a knife, ignored explicit and repeated commands at gunpoint to drop the knife and stop his approach."

42.     Finally, Mr. Hernandez's family filed a lawsuit against Officer McBride, claiming she used excessive force. The Court granted summary judgment to Officer McBride, for the same reasons given by the DOJ: the undisputed evidence shows that she properly and reasonably used necessary force to protect herself and others.

43.     Officer McBride's actions were proper and necessary. The Department has never alleged or suggested that she did anything wrong.

**2022: Chief Moore Repeatedly Intervenes to Block Officer McBride's Career Advancement—and Tells Her That He's Doing It Because He Doesn't Like Her Social Media, and that He'll Keep Doing It**

44.     Supervisors within LAPD recognized her merit and potential. After the reviews were completed, she was sought-after within the Department and offered multiple opportunities for advancement. But Chief Moore personally intervened to block them.

45.     First, he personally intervened to extend her period of Risk Management Executive Committee restricted duty (RMEC).   RMEC placement is standard following a shooting. Officer McBride was placed on a standard six-month RMEC in the spring of 2021, which should have been completed in November 2021. But Chief Moore personally intervened to extend it to a full year—overruling his own Constitutional Policing advisor and committee.

46.     Then, in September 2022, Officer McBride was offered a posting in Rampart Patrol. She was eager to accept the posting, and the command staff of Rampart Division were eager to have her.  But Chief Moore personally intervened to block the transfer.

47.     Chief Moore told Officer McBride why he was doing this.  We know why he did it, because on September 30, 2022, he called Officer McBride into his office and told her why he was doing it.  On his own and without any legal or policy basis, he decided that he didn't think Officer McBride's "image" was "right" for the department.  He personally intervened to block the P-3 promotion and Police Academy instructor position.  This intervention is unheard of.  The Chief of Police simply does not play a part in promotions from P-2 to P-3, or in duty assignments of P-2 and P-3 officers.  This has been true for decades, over tens of thousands of promotions and transfers.

48.     Chief Moore has more important things to do with his time than to spend it watching the personal, off-duty social media videos posted by 25 year-old female officers.

49.     Chief Moore has no business making a personal decision—not grounded in any articulable law, policy, or rule—that a 25 year-old female officer's personal, off-duty social media video is "inappropriate" or "sends the wrong message."

50.     On September 30, 2022, Chief Moore summoned Officer McBride to his office.  He did not utilize the chain of command, but instead told the President of the officers' union (the Police Protective League ("PPL"), Lieutenant Craig Lally, to tell Officer McBride to come and see him.  This was highly irregular, but Officer McBride did as she was told.

51.     When she arrived, at approximately 1:30 p.m., on September 30, 2022, she first met with Deputy Chief Randolph outside the Chief's office.  Deputy

Chief Randolph told her that the Chief "wanted to have a heart to heart" about her social media.

52.    Deputy Chief Randolph then escorted Officer McBride into Chief Moore's office, and remained during the meeting.  Deputy Chief Randolph is a witness to the meeting and can testify about what Chief Moore said.

53.    Chief Moore told Officer McBride that he wanted her to cease posting videos on social media.  He said that Officer McBride needed to "choose between being an LAPD officer" or posting social media videos.  He specifically referenced her videos showing her competing in and training for shooting competitions.  The competitions at issue are nationally recognized, prestigious competitions entered by people from around the world, including many other police officers.  In most of her videos, Officer McBride is wearing shorts or jeans, and a t-shirt or tank top. Chief Moore told her that he didn't like her "image" in the videos, and said that they were "inappropriate."

54.    He told her he wanted her to take down all her videos and not post any more.  "It's one or the other," he said—her social media postings or her career.  He told her he would personally block any reassignments and ensure that she remained in a desk assignment unless she deleted all her social media. "You're on the desk," he said, "and no one will promote you off the desk.  And don't think you can wait me out."

55.    Chief Moore told her that he was aware that she had been offered the patrol assignment in Rampart, but that he had personally blocked it.  "I know you want to go to Rampart," he said, "but there's no way you're going there."

56.    He continued: "I kept giving you hints to stop with social media, but you never listened."

57.    After the meeting, Deputy Chief Randolph confirmed that when Chief Moore used the term "inappropriate," he was referring to Officer McBride's attire and appearance, which the Chief considered too revealing.

58.     The Chief's comments and actions were sexist, demeaning, and discriminatory.

59.     He took adverse employment actions against Officer McBride based on conduct—posting personal social media videos of herself wearing shorts and/or t-shirts while shooting guns—that literally *dozens* of male LAPD officers engage in daily, and have engaged in for years.  Instagram and Facebook are replete with identical content posted by male LAPD officers, as set forth herein.

60.     Yet Officer McBride—the only female LAPD officer posting such content—was singled out by the Police Chief, called into his office, told that she needed to take down all of her videos because they were "inappropriate," told that the Chief would personally ruin her career, keep her "on a desk," and ensure that she never promoted, if she didn't take them down.  And then the Chief followed through with his threat and actually blocked a promotion and two transfers for Officer McBride.  All of this for social media videos that are identical in all relevant respects to those posted daily by dozens of male LAPD officers.

61.     Here is a typical example of Officer McBride's posted images:



62.     Dozens of male officers on the LAPD have posted, and regularly post, videos of themselves training and target shooting. There are hundreds of such photos and videos of male LAPD officers those those officers have posted on their personal social media.

63.     Chief Moore has never told any of those male officers to take down their social media images.

64.     He has never called any of those male officers into his office and berated them and told them their content was "inappropriate."

65.     He has never threatened to destroy their careers and keep them "on a desk" to ensure they never promote if they don't remove their images.

66.     He has never intervened to block their promotions or transfers if they don't remove their images.

67.     He did those things only to Officer McBride—the only female posting videos of herself target shooting.

68.     Plaintiff is personally aware of, and has viewed, videos and photos posted on social media by at least twenty-eight (28) male LAPD officers, showing those officers shooting guns, on ranges or in the desert.

69.     Of those 28 officers, at least ten (10) have also been involved in officer-involved shooting (OIS) incidents on the job with the LAPD.  Accordingly, any claim by the City or Chief Moore that his treatment of Officer McBride was based on the above-described OIS rather than her gender, is blatantly pretextual.

70.     There simply is no plausible claim that the Chief's demand that Officer McBride "take down her social media" or be blocked forever from promoting was not based on Officer McBride's gender.  It certainly was not based on the content—shooting guns at a shooting range—given that Chief Moore has no problem with numerous male officers posting the exact same content, and Chief Moore has never blocked those officers' promotions or transfers, or called them in and told them that they must take down their social media or they will never promote.

71.     But with Officer McBride—the only female posting such content—Chief Moore acted very differently from how he treated all the male officers.

72.     Chief Moore has never summoned any of these male officers to his office to tell them that he thinks their "image" is "inappropriate."

73.     Moreover, there is nothing "inappropriate" in any way about anything that any of these officers posted—the male officers and Officer McBride alike.  No officer should be disciplined or subjected to an adverse employment action based on these posts, images, and videos.  And the Chief and LAPD know this perfectly well—because none of the male officers have ever been disciplined or subjected to an adverse employment action.  Just Officer McBride—the only female.

74.     In addition to blocking her transfer to Rampart, Chief Moore carried out his threat to personally block any other transfers or promotions.  He blocked her again a month later when she was offered a promotion to Police Officer-3, and a position as an instructor at the Police Academy.

75.     On November 9, 2022, she completed her oral interview for a promotion to P-3 and a position as an instructor at the Academy.

76.     She was recommended for the position by the entire chain of command.  But Chief Moore again personally intervened and blocked her promotion.  That act was highly unusual.  The Chief of Police is not, by practice, policy, or custom, personally involved in promotions or transfers of officers at the rank of P1, P2, and P3.

77.     Her promotion and job offer was reviewed and approved by all the relevant supervisors at the Academy, and up through the Deputy Chief level at headquarters.  Under the ordinary customs and practices of the Department, going back decades, she would have begun her new assignment.

78.     But Chief Moore personally intervened again.  He went against decades of customs and practices, and personally blocked her promotion and appointment as an Academy instructor.  This vindictive action contravened the longstanding prior customs and practices of Chief Moore and prior Chiefs of Police.

79.     In December, 2022, Chief Moore personally intervened again to harm and impair Officer McBride's career.  On November 30, 2022, her supervisor, Captain Walters, of Northeast Division, notified her that the state Department of Justice had officially reported its findings to the LAPD regarding the April 2020 OIS, finding that all her actions were proper and reasonable.  On December 1, 2022, the LAPD's Risk Management Executive Committee, headed by Constitutional Policing Advisor Elizabeth Rhodes, made its official determination and recommendation that Officer McBride should be fully restored to patrol duty,

her duty restrictions should be removed, and the review process should be concluded.

80.     The Risk Management Executive Committee is the body of career professionals designated by the LAPD to make decisions about officers' status during OIS reviews.  It is made up of career civil servants, including Captain Robin Petillo and Constitutional Policing Advisor Elizabeth Rhodes, whose job is to make these determinations and recommendations.

81.     The purpose of having a Risk Management Executive Committee is to ensure that decisions about officers' status following incidents such as officer-involved shootings are made based on evidence and deliberation, and not just the arbitrary fiat of the Police Chief.

82.     Chief Moore has accepted the Risk Management Executive Committee's determinations and recommendations in virtually every review case presented to him.

83.     This time, though, Chief Moore personally intervened again.  He rejected the Committee's determination and recommendation, and ordered her kept on restricted status for at least another six months.  This personal intervention by the Chief is extremely unusual and goes against years of longstanding practices and customs of the Department.  Chief Moore gave no official explanation for his action. His memo, which he signed on December 12, 2022, provides no explanation at all.  But he told Officer McBride exactly why he was interfering in her career: "I told you to get off social media, and you didn't take the hint."

84.     The restricted status Chief Moore has forced on Officer McBride has adversely affected her career, work environment, and psychological and emotional well-being.  It has kept her literally "on a desk," unable to work any patrol assignments or specialty assignments. In addition to impairing her ability to promote, it has also led to a hostile work environment, as other officers have complained about her not working patrol assignments.

85.     Chief Moore's adverse employment actions against Officer McBride were based on Officer McBride's gender.  The Academy instructor position—which the Academy wanted to give to Officer McBride—was, after the Chief blocked her promotion and transfer, given to a male officer.  That male officer was not more qualified than Officer McBride, who was the Academy's top choice.

86.     And neither Chief Moore nor anyone else at the LAPD ever took any adverse employment actions against the numerous male officers who regularly post social media videos identical in all relevant respects to Officer McBride's videos.

87.     Nor did Chief Moore ever personally intervene to overrule the Risk Management Committee's decision with respect to restoring a male officer to full duty.

88.     He did all of this just to Officer McBride.  And he did it, in his own words, because he did not think that her social media postings—which don't violate any rules or standards and which are in all respects identical to hundreds of videos and photos posted on the social media of dozens of male LAPD officers—were "inappropriate."

89.     When a supervisor at a public agency punishes a female employee because he says her social media posts are "inappropriate," while allowing dozens of male employees to post identical content, that is the very definition of gender discrimination.

## OFFICER MCBRIDE'S DAMAGES

90.     Officer McBride was shocked by the Chief's statements and actions. She knew that there was nothing "inappropriate" about her Social Media Posts. She knew that dozens of male officers routinely posted identical content.  Indeed, she had modeled her own content on the videos and photos posted by male officers she admired.

91.     She had not done anything wrong.  Yet here she was—a 25 year-old woman—being called into the Police Chief's office alone, and berated and threatened by the Chief with the loss her career and dreams, all because he thought it "inappropriate" for her to post (on her personal social media, on her own time) the exact same type of videos that dozens of her male colleagues in the Department posted every day.

92.     Officer McBride's stress and anxiety grew when she learned that the Chief had personally blocked her promotion and assignment as an Academy instructor, and personally blocked her transfer to a Rampart patrol position.

93.     She began experiencing severe physical symptoms caused by and exacerbated by the stress, and was diagnosed with work-related illnesses that made it difficult for her to function.

94.     She went out on medical leave in November 2022, as the physical symptoms worsened, resulting in her hospitalization in early December 2022.  She remains out on medical leave.

95.     She experienced extreme emotional distress and psychological injury. Since she was a little girl, it had been her dream to be an LAPD officer.  Now that dream was being shattered, and all because Chief Moore thought it was "inappropriate" for her to post social media videos of herself training for shooting competitions in a t-shirt—while dozens of male officers posted identical content.

96.     The Chief's message to Officer McBride was loud and clear: you have no place in this department, and I will personally see to it that your career is destroyed, because I don't like your personal social media and "you didn't get the hint."  She knows he was serious in his threat because he did in fact personally block her promotion and transfer.

97.     She has been forced out of the job she loves, solely because the "image" that the Chief likes and approves of in male officers, he deems "inappropriate" in a female.  She is devastated.  She has been constructively

discharged from the LAPD, because in these circumstances, she cannot return to work.  Chief Moore will not let her work.  He told her that explicitly, and he followed through to prove he was serious.

98.     Chief Moore's misogyny, prejudice, and disregard for the law has cost Officer McBride what would have been a long career in the LAPD serving the community.

99.     That loss is measured both by the emotional and psychological harm of losing the career she had dreamed of fulfilling, and also by the economic value of a 25-year career in the LAPD followed by another 25 years receiving a pension, plus the value of the healthcare and other benefits earned by LAPD officers.  The economic value of that loss is not less than $5 million.

## CLAIMS FOR RELIEF
### First Claim for Relief
### Discrimination Based on Gender (42 U.S.C. § 1983)
### (OFFICER MCBRIDE against ALL DEFENDANTS)

100.    Plaintiff realleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

101.    Plaintiff was subjected to adverse employment actions by Defendants.

102.    Defendants subjected Plaintiff to adverse employment actions because of Plaintiff's gender.

103.    Plaintiff's gender was a motivating factor in Defendants' adverse employment actions against Plaintiff.

104.    Plaintiff was qualified for the positions which Defendants denied her.

105.    Similarly situated male individuals were treated more favorably.

**Second Claim for Relief**
**Retaliation (Adverse Employment Action in Public Employment) for**
**Protected Speech (42 U.S.C. § 1983)**
**(OFFICER MCBRIDE against ALL DEFENDANTS)**

106. Plaintiff realleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

107. Plaintiff engaged in protected speech when she made the Social Media Posts, by speaking as a citizen on matters of public concern.

108. Defendants subjected Plaintiff to an adverse employment action based on the Social Media Posts.

109. Plaintiff's Social Media Posts were a substantial motivating factor for the adverse employment actions Defendants took against Plaintiff.

**Third Claim for Relief**
**Disparate Treatment (Cal. Gov. Code § 12940(a))**
**(OFFICER MCBRIDE against ALL DEFENDANTS)**

110. Plaintiff realleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

111. At all relevant times, the LAPD had five or more employees and was a covered employer under FEHA. At all relevant times, Chief Moore was a supervisory employee and/or officer at the LAPD, and Plaintiff was an employee covered by FEHA.

112. Defendants took adverse employment actions against Plaintiff based on Plaintiff's protected characteristic of gender.

113. Plaintiff's gender was a substantial motivating factor in Defendants taking adverse employment actions against Plaintiff.

114. Plaintiff was harmed by Defendants taking adverse employment actions against her.

115.   Defendants' conduct was a substantial factor in the harm to Plaintiff set forth in this Complaint and discussed in the preceding paragraph.

### Fourth Claim for Relief
### Disparate Impact in Violation of Gov. Code § 12940(a)
### (OFFICER MCBRIDE against ALL DEFENDANTS)

116.   Plaintiff realleges and incorporates by reference all preceding and succeeding paragraphs as though fully set forth herein.

117.   At all relevant times, the LAPD had five or more employees and was a covered employer under FEHA.  At all relevant times, Chief Moore was a supervisory employee and/or officer at the LAPD, and Plaintiff was an employee covered by FEHA.

118.   Although dozens of male LAPD officers regularly post social media content identical in all relevant respects to Plaintiff's social media content, and although many of those male officers have also been involved in OIS incidents, Defendants took adverse employment actions solely against Plaintiff.

119.   Gender is a protected characteristic as a matter of law.

120.   Plaintiff was harmed by Defendants taking adverse employment actions against her.

121.   Defendants' conduct was a substantial factor in the harm to Plaintiff set forth in this Complaint and discussed in the preceding paragraphs.

### PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays for Judgment against DEFENDANTS for:

1. Compensatory damages, economic and non-economic damages in excess of $5,000,000, in an amount according to proof;

2. General damages to compensate OFFICER MCBRIDE for mental and emotional injuries;

3. Attorneys' fees pursuant to 42 U.S.C. § 1988;

4. Exemplary or punitive damages as to DEFENDANT CHIEF MOORE in an amount according to proof that is sufficient to punish and prevent future violations of constitutional rights (namely: (1) the deliberate retaliation against, punishment of, or constructive termination of, a public employee based on the employee's protected First Amendment speech as a private citizen on matters of public concern; (2) deliberate and blatant gender discrimination, by destroying her career because of social media posts identical to those posted by dozens of male LAPD officers).

6. Costs of suit;

7. Post-judgment interest;

8. Such additional relief as the Court may deem proper.


DATED:  April 18, 2023          Respectfully submitted,



CALEB E. MASON
Werksman, Jackson & Quinn, LLP
Attorney for Plaintiff

**DEMAND FOR JURY TRIAL**

Officer McBride respectfully demands a jury trial.


DATED:  April 18, 2023          Respectfully submitted,



CALEB E. MASON
Werksman, Jackson & Quinn, LLP
Attorney for Plaintiff

22
COMPLAINT